22CA0124 Peo v Manzanares 03-06-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 22CA0124
Adams County District Court No. 21CR744
Honorable Priscilla J. Loew, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Robert Ernest Manzanares,

Defendant-Appellant.

---

JUDGMENT AFFIRMED

Division II
Opinion by JUDGE LUM
Fox and Hawthorne*, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced March 6, 2025

---

Philip J. Weiser, Attorney General, Joshua J. Luna, Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Victor T. Owens, Alternate Defense Counsel, Parker, Colorado, for Defendant-Appellant


*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2024.

¶ 1    Defendant Robert Ernest Manzanares appeals his conviction for accessory to crime.  We affirm.

## I.    Background

¶ 2    On March 6, 2021, police were called to Sportswatch Bar & Grill in Westminster to respond to a shooting that killed two victims, W.A. and J.Y.  Members of the North Side Mafia (NSM) gang were known to patronize the bar.  Police later learned that the fatal shots were fired by Steven Muniz, a regular customer.

¶ 3    A few minutes before the shooting, a fight broke out inside Sportswatch, involving pushing, shoving, and "gang signs [being] thrown."  W.A. and his friend were on one side of the fight, and Muniz, Manzanares, and about ten others were on the other.

¶ 4    Muniz appeared to be instigating the fight and sparring with W.A.  Manzanares unsuccessfully tried to pull Muniz away after being asked to do so by bar security guard Travis Hart.  Surveillance footage then captured someone (possibly Muniz) punching W.A.'s friend at around 1:06 a.m.

¶ 5    Between 1:09 and 1:10 a.m., several bar patrons, including Muniz, Manzanares, and the victims, exited the bar.  Hart, noticing

an altercation in the bar parking lot, deployed pepper spray to disperse the altercation and the crowd that had formed around it.

¶ 6 Bogdan Tocarciuc, another security guard, saw Muniz running with a gun. Surveillance footage showed that Muniz initially fired several bullets about a minute after he, Manzanares, and the victims exited the bar. Tocarciuc drew his gun and chased Muniz to a dark-colored truck. Muniz shot at Tocarciuc over the truck bed, but Tocarciuc wasn't hit. Tocarciuc then observed Muniz enter the passenger side of the truck before it sped away. He identified Manzanares as the truck's driver. Surveillance footage captured the truck leaving the parking lot seconds after Muniz shot at Tocarciuc.

¶ 7 Manzanares was arrested about two weeks after the shooting and charged with one count of accessory to crime. The jury convicted Manzanares as charged, and he was sentenced to three years in prison and two years of mandatory parole.

¶ 8 Manzanares appeals.

## II.    Sufficiency of the Evidence

¶ 9     Manzanares first contends that the evidence presented at trial was insufficient to support his conviction for accessory to crime. We disagree.

### A.    Standard of Review

¶ 10     We review the sufficiency of the evidence de novo. *McCoy v. People*, 2019 CO 44, ¶ 63. We examine the evidence as a whole to determine whether it is substantial and sufficient for a reasonable mind to find the defendant guilty of the crime beyond a reasonable doubt. *Id.* "This analysis requires us to 'give the prosecution the benefit of every reasonable inference which might be fairly drawn from the evidence.'" *People v. Perez*, 2016 CO 12, ¶ 25 (quoting *People v. Gonzales*, 666 P.2d 123, 128 (Colo. 1983)). However, a "verdict cannot be supported by guessing, speculation, conjecture, or a mere modicum of relevant evidence." *Id.* at ¶ 25.

¶ 11     "The jury, not the court, must perform the fact-finding function when conflicting evidence — and conflicting reasonable inferences — are presented." *Id.* at ¶ 31. This court cannot invade the jury's province by acting as the "thirteenth juror," and where the record supports the jury's conclusion, we do not "second-

guess[]" it.  *Id.* at ¶¶ 25, 31 (quoting *People v. Bennett*, 515 P.2d 466, 469 (Colo. 1973)).

## B.    Applicable Law

¶ 12    As relevant here, "[a] person is an accessory to crime if, with intent to hinder, delay, or prevent the discovery, detection, apprehension, prosecution, conviction, or punishment of another for the commission of a crime, he renders assistance to such person." § 18-8-105(1), C.R.S. 2024.  "[R]ender[ing] assistance" means "harbor[ing] or conceal[ing]" the principal after they commit the crime.  § 18-8-105(2)(a).

¶ 13    The jury convicted Manzanares of accessory to crime, specifically finding that he knew Muniz was "suspected of or wanted for the crime of" attempted first degree murder.[1]  "The relevant standard for knowledge in regard to the accessory statute is whether [the] defendant knew the principal had committed a crime. It is not necessary for the defendant to have known that the crime committed was of a particular class."  *People v. Young*, 555 P.2d

---

[1] Accessory to crime may be a petty offense, a class five felony, or a class four felony depending on what type of offense the defendant knew the principal committed (or was suspected to have committed).  *See* § 18-8-105(3)-(6), C.R.S. 2024.

4

1160, 1162 (Colo. 1976). Moreover, a defendant need not know the elements of the underlying offense, only its "general character." *Barreras v. People*, 636 P.2d 686, 688 (Colo. 1981).

### C. Analysis

¶ 14    Manzanares contends that (1) the evidence did not "establish that [he] drove Muniz from the scene of the shooting" and (2) there was no evidence showing that Manzanares knew that Muniz was suspected of or wanted for attempted first degree murder. We disagree.

¶ 15    Sufficient evidence supported the jury's finding that Manzanares "render[ed] assistance" to Muniz by driving him away from the crime scene. § 18-8-105(1). Tocarciuc, who witnessed the shooting, identified Manzanares out of a photographic lineup as the driver of the vehicle in which Muniz fled. He also said that the vehicle was the same as or was "exactly like" the vehicle he had seen Manzanares drive to the bar on previous occasions.

¶ 16    Sufficient evidence also supported the jury's finding that Manzanares knew Muniz was suspected of committing attempted first degree murder:

- Hart testified that Muniz was "involved heavily in the fight" that occurred in the bar. Manzanares tried to deescalate the fight by telling Muniz, "[I]t's not worth it" and pulling Muniz away from the conflict. A jury could infer from this evidence that Manzanares knew Muniz was angry with the other bar patrons and might become violent.

- Manzanares told police that, after he exited the bar, he saw the security guards with their guns drawn. Hart and Tocarciuc both testified that they drew their weapons just after the shooting began. From this evidence, a jury could reasonably infer that Manzanares witnessed the shooting.

- Security footage from different areas of the bar's exterior indicated that Manzanares followed Muniz out of the bar shortly before the shooting. The footage then showed (1) Manzanares's taillights activated approximately a minute before the shooting started; (2) a person was in the driver's seat of Manzanares's truck during the duration of the shooting; (3) Muniz disappeared near the passenger

side of the truck around the time of the shooting; (4) the truck's taillights were brightened almost immediately after Muniz disappeared from view; and (5) the truck then drove away. Combined with Tocarciuc's testimony that Muniz got into the car and Manzanares was in the driver's seat, the jury could reasonably infer that Manzanares was in the car during the shooting and that he waited for Muniz before leaving.

- Tocarciuc testified that Muniz shot at him from near the bed of Manzanares's truck before getting inside the passenger side of the truck and speeding off. The jury could reasonably infer that Manzanares, as the truck's driver, saw or heard Muniz's shot.

¶ 17 We reject Manzanares's suggestion that the evidence was insufficient because Tocarciuc had "changed his story" or because evidence reflected he had been pepper-sprayed shortly before he witnessed Muniz get into Manzanares's car. It is the jury's sole province to "weigh the credibility of witnesses, to determine the weight to give [to] all parts of the evidence, and to resolve [evidentiary] conflicts." *People v. Poe*, 2012 COA 166, ¶ 14.

¶ 18    For these reasons, we conclude that the evidence was sufficient to support Manzanares's conviction for accessory to crime.

### III.    Admission of Gang-Related Evidence

¶ 19    Manzanares next contends that the trial court committed reversible error by admitting gang-related evidence.  We disagree.

### A.    Additional Facts

¶ 20    Before trial, the prosecution moved to introduce limited NSM gang evidence to explain (1) the role of gang tensions in the bar fight that preceded the shooting; (2) that Manzanares and Muniz were "more than casual acquaintances;" and (3) the reluctance of the shooting's witnesses to cooperate or provide a full account of the events.

¶ 21    At a pretrial hearing, Manzanares objected to admitting gang evidence under CRE 403.  The Court allowed the proposed gang evidence and concluded that it was (1) relevant to explain Manzanares's motive and the witnesses' changed statements or ability to testify and (2) not unduly prejudicial.

¶ 22    At trial, the prosecution elicited testimony showing the following:

- NSM had a "presence" at Sportswatch, and bar patrons had "hail[ed] . . . North Side" at a past event.

- "Most of the people . . . at Sportswatch were North Siders or affiliated with the [NSM]."

- Tocarciuc observed "gang signs [being] thrown" prior to the bar fight on the night of the shooting.

- After Muniz became involved in the bar fight with W.A., bar security asked Manzanares to calm Muniz down, saying, "Hey, get your brother under control." Manzanares attempted to do so.

- Manzanares and Muniz had a close relationship and called each other "brothers."

- Manzanares had influence with bar patrons, and on prior occasions, security had asked him to help deescalate conflicts at the bar.

- During Tocarciuc's initial interview with police after the shooting, he said, "When you mess with one of those guys . . . you mess with them all." When asked to explain his statement, he elaborated that, in his experience, gang members have a "collective mentality"

9

and "will all . . . try to retaliate" if someone "degrade[s] anyone in [their] group." He added, "[G]enerally speaking . . . you are not just dealing with one person, you are dealing with everybody."

### B. Standard of Review and Applicable Law

¶ 23 In general, all relevant evidence is admissible. CRE 402. Evidence is relevant if it tends to make the existence of any fact of consequence to the determination of the action more probable or less probable than it would be without the evidence. CRE 401.

¶ 24 Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. CRE 403. Evidence is considered unfairly prejudicial if it has an "undue tendency to suggest a decision on an improper basis . . . such as sympathy, hatred, contempt, retribution, or horror." *People v. Clark*, 2015 COA 44, ¶ 18 (citation omitted).

¶ 25 Because gangs are viewed with disfavor by society, gang-related evidence must be admitted with care. *Id.* at ¶ 16. However, such evidence is admissible to show motive for the crime or to "understand a witness's change in statement or reluctance to

testify." *Id.* at ¶ 15; *People v. Shanks*, 2019 COA 160, ¶ 73; *see also People v. Trujillo*, 2014 COA 72, ¶ 72.

¶ 26 We review a trial court's evidentiary rulings for an abuse of discretion. *Clark*, ¶ 14; *Shanks*, ¶ 72. A trial court abuses its discretion if its decision is manifestly arbitrary, unreasonable, or unfair. *Clark*, ¶ 14. In reviewing a trial court's determination under CRE 403, "we assume the maximum probative value that a reasonable fact finder might give the evidence and the minimum unfair prejudice to be reasonably expected." *Id.* at ¶ 18.

### C. Analysis

¶ 27 Manzanares contends that the trial court abused its discretion by admitting the above-described evidence because it was either irrelevant or its relevance was substantially outweighed by the danger of unfair prejudice. We disagree.

¶ 28 The evidence that Manzanares and Muniz were like "brothers" and that security had asked Manzanares to "get your brother under control" was relevant to refute the defense's argument that he and Muniz were only "loose[ly] associat[ed]." It also helped explain why Manzanares might have been motivated to assist Muniz after the shooting. And as described in Part II.C above, it tended to show

11

that Manzanares knew Muniz was angry before the shooting occurred.

¶ 29 The evidence about gang presence in the bar, gang involvement in the bar fight,[2] and the "collective mentality" of gang members was relevant to explain why Tocarciuc's statements may have changed over time and to refute Manzanarez's argument that Tocarciuc was an unreliable witness due to his changing statement. *Id.* at ¶ 15.

¶ 30 None of the evidence described above was substantially more prejudicial than it was probative. None of the evidence directly linked Manzanares to NSM or NSM activities, which mitigates any potential prejudice from gang references. To the extent the jury might have connected Manzanares, Muniz, and NSM, that connection would be highly relevant to demonstrate the close nature of Manzanares's and Muniz's relationship and to explain Manzanares's motive to help Muniz after the shooting. *Id.*

---

[2] We reject Manzanares's argument that there was "no evidence" that the bar fight and shooting were gang related. Tocarciuc's testimony indicated that gang signs were thrown and that two opposing groups were present prior to the fight, and the shooting occurred less than ten minutes after the fight.

("Evidence about gang culture is admissible if relevant to . . . show a motive for the crime itself . . . .") (citation omitted).[3] And even if the jury made this connection, we reject Manzanares's arguments that the evidence was unduly prejudicial.

¶ 31    As best we understand him, Manzanares first argues that the evidence about security asking him to get Muniz under control and to deescalate prior incidents at the bar was prejudicial because the jury might have thought that Manzanares "could have stopped the [shooting] . . . by telling his people to stop, calm down, and go home." But this rises far above the "minimum unfair prejudice" that can be reasonably expected from the evidence. *Id.* at ¶ 18. Contrary to Manzanares's argument, this evidence was either neutral or tended to suggest that security viewed Manzanares as someone who could deescalate conflict.

---

[3] For the first time in his reply brief, Manzanares references Tocarciuc's testimony quoting an email that directly linked Manzanares to NSM. We do not address any argument related to the propriety of that evidence. *People v. Montante*, 2015 COA 40, ¶ 58 n.4 (declining to address arguments raised for the first time on reply). To the extent Manzanares references comments made by the prosecutor during opening or closing statements, such statements are not evidence, and Manzanares doesn't raise a prosecutorial misconduct argument in this appeal.

¶ 32    Next, Manzanares argues that the testimony describing the bar as gang-affiliated was inaccurate and prejudicial.  To the extent descriptions of the bar's character differed, it was the jury's role to weigh the evidence and resolve any evidentiary conflicts.  *Poe*, ¶ 14.  And in any event, we can't discern how evidentiary conflicts about the nature of the bar detract from the relevance of the evidence or unduly prejudice Manzanares.

¶ 33    For all these reasons, the trial court didn't abuse its discretion by admitting this evidence.

## IV.    Alexander Moore Drug Evidence

¶ 34    Finally, Manzanares contends that the court erred by admitting evidence of drugs found in connection with the apprehension and arrest of Alexander Moore.  We perceive no reversible error.

### A.    Additional Facts

¶ 35    After the shooting occurred, police received reports that a different vehicle, driven by Alexander Moore, was speeding away from Sportswatch and may have been involved with the shooting.  After a high-speed chase, officers discovered Moore alone in his

vehicle. Police recovered a bag of suspected drugs and a scale covered in white residue from Moore's vehicle. Moore was arrested.

¶ 36 Based on the parties' discussions in pretrial proceedings and defense counsel's remarks in opening statements that the prosecution's case was based on "false assumptions," "loose associations," and "an absence of evidence," the prosecution anticipated that Manzanares sought to make poor police investigation a theme of his defense. Accordingly, on the third day of trial, the prosecution introduced into evidence the bag of suspected drugs and the scale found in Moore's car to (1) demonstrate the completeness of the investigation and (2) refute a possible alternate suspect defense by establishing that Moore fled the scene due to his drug possession and not because he was the shooter.

¶ 37 Defense counsel objected on relevance grounds and argued that she had not endorsed an alternate suspect theory. The court admitted the evidence, stating that even though "no one argued alternative suspect . . . [the drug evidence] gives a larger view [of] what everybody was doing, what people did as part of this investigation." It added, "[T]here is limited prejudice to Mr.

Manzanares because [the drug evidence] is so disassociated with what is alleged for him to have done in this case."

### B. Standard of Review and Applicable Law

¶ 38 We review a trial court's evidentiary rulings for an abuse of discretion. *Russell v. People*, 2017 CO 3, ¶ 5.

¶ 39 Preserved claims of evidentiary error are reviewed under the harmless error standard. *People v. Quillen*, 2023 COA 22M, ¶ 14; *People v. Martinez*, 2020 COA 141, ¶ 27. "Under this standard, even if we discern an error, reversal is not required unless the error substantially influenced the verdict or affected the fundamental fairness of the trial." *People v. Denhartog*, 2019 COA 23, ¶ 35. Unpreserved allegations of error are reviewed under the plain error standard. *People v. Miller*, 113 P.3d 743, 749 (Colo. 2005).

¶ 40 The parties disagree on whether Manzanares's objections to the drug evidence preserved the claims he asserts on appeal and on whether he invited any error relating to the admission of the evidence. We need not resolve these disputes, however. Even if we assume that Manzanares properly preserved his arguments and that the doctrine of invited error doesn't apply, we conclude that any error was harmless.

## C.    Analysis

¶ 41    Manzanares contends that the evidence of drugs found in Moore's car was "highly prejudicial."  He argues that the "only reasonable inference the jury could make when considering this evidence is that [Moore's] high-speed chase, the . . . purported cocaine, and drug dealing paraphernalia, is somehow tied to" him. We disagree.

¶ 42    Even assuming that the trial court erred by admitting the evidence of drugs found in Moore's car, we cannot discern how this evidence prejudiced Manzanarez.  The drug-related evidence was minimal, and no evidence suggested that Moore and Manzanares were connected in any way.  In fact, defense counsel elicited testimony from responding officers that Manzanares was not seen anywhere near Moore's vehicle the night of the shooting and that there was no evidence Manzanares was ever in Moore's vehicle. Manzanares's argument that the jury would "tie" him and Moore together is entirely speculative.

¶ 43    Accordingly, we conclude that the drug evidence could not have "substantially influenced the verdict or affected the

17

fundamental fairness of the trial," and any error in its admission was therefore harmless. *Denhartog*, ¶35.

## V. Disposition

The judgment of conviction is affirmed.

JUDGE FOX and JUDGE HAWTHORNE concur.